### In re SOUTHERN INDUSTRIAL BANKING CORPORATION, d/b/a Daveco, Debtor.

**Thomas E. DuVOISIN, Liquidating Trustee, Plaintiff,**

v.

**Hugh G. ANDERSON and Hazel Anderson, et al., Defendants.**

**Bankruptcy No. 3–83–00372.**

United States Bankruptcy Court, E.D. Tennessee.

Sept. 26, 1986.

## MEMORANDUM ON THE LIQUIDATING TRUSTEE'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

CLIVE W. BARE, Bankruptcy Judge.

Plaintiff in these consolidated preference actions, 11 U.S.C.A. § 547 (West 1979), is the liquidating trustee of a trust established under the modified plan of reorganization confirmed by the court in the Southern Industrial Banking Corporation (SIBC) case. Defendants, former holders of investment certificates sold by SIBC, received full or partial payment on their investment certificates within the 90–day period preceding the filing of the SIBC bankruptcy petition. Plaintiff seeks partial summary judgment on twelve different issues, including the authority of this court to decide these preference actions. 28 U.S.C.A. § 157(a) and (b) (West Supp.1986).[1]

1. The issues on which plaintiff seeks partial summary judgment, pursuant to motions filed April 22 and July 22, 1985, are: (1) whether SIBC was eligible for relief under the Bankruptcy Code, 11 U.S.C.A. § 109 (West 1979 & Supp. 1986); (2) whether lack of notice of chapter 11 proceedings to a preference defendant bars a preference action; (3) whether pre-bankruptcy fraud on the part of SIBC bars prosecution of the preference actions; (4) whether prosecution of the preference actions is contrary to the confirmed plan of reorganization; (5) whether laches or waiver bars the actions, due to unreasonable delay or because the actions are brought postconfirmation; (6) whether this court can constitutionally decide these actions; (7) whether plaintiff has standing as a representative of the estate, 11 U.S.C.A. § 1123(b)(3) (West 1979); (8) whether recovery will properly benefit unsecured creditors; (9) whether the transfers plaintiff seeks to avoid enable the transferee to receive more than would have been received if the transfer had not been made and payment was made instead pursuant to the provisions of chapter 7 of title 11, 11 U.S.C.A. § 547(b)(5) (West 1979); (10) whether the exceptions provided by 11 U.S.C.A. § 547(c)(1), (2) and (4) (West 1979) are inapplicable; (11) whether for purposes of Bankruptcy Code § 547(c)(2), if ap-

## I

On March 10, 1983, SIBC filed its chapter 11 petition. SIBC operated as a debtor in possession only until April 18, 1983, when this court ordered the appointment of a trustee due to the gross mismanagement of the affairs of SIBC. 11 U.S.C.A. § 1104(a)(1) (West 1979). On April 19, 1983, the court appointed Irwin Deutscher as trustee. On November 28, 1983, the court confirmed a modified plan of reorganization (proposed by trustee Deutscher) conditioned upon the occurrence of certain contingencies. Those contingencies were either satisfied or waived, and the court entered an order of confirmation effective January 20, 1984.

Pursuant to Order No. 92, entered January 20, 1984, the court appointed plaintiff Thomas E. DuVoisin as the liquidating trustee of the Creditors' Liquidation Trust created under the SIBC plan for reorganization. Claims based on preferential transfers are assets of the Creditors' Liquidation Trust. In accordance with his duties as liquidating trustee, between May 21, 1984, and April 19, 1985, plaintiff filed more than nine hundred (900) adversary proceedings seeking to recover alleged preferences from SIBC investors who cashed their investment certificates, both prior to and upon maturity, within the 90–

day period preceding the filing of the SIBC bankruptcy petition. On May 23, 1985, pursuant to Bankruptcy Rule 7042, the court consolidated these adversary proceedings.

## II

### SIBC's Eligibility as a Debtor Under Title 11

On September 23, 1985, upon the motion of certain defendants, the district court withdrew the reference to this court of the consolidated preference actions. 28 U.S.C.A. § 157(d) (West Supp.1986). In the district court the defendants [2] argued that SIBC was not eligible to be a debtor in bankruptcy because it was a "bank" or "industrial bank" or "similar institution." 11 U.S.C.A. § 109 (West 1979 & Supp. 1986).[3] Disagreeing, the district court concluded SIBC was not a "bank" within the scope of § 109(b)(2) and that under either the state classification test or the independent classification test SIBC was eligible to be a debtor in bankruptcy. *DuVoisin v. Anderson (In re Southern Industrial Banking Corp.)*, 59 B.R. 978, 986 (E.D. Tenn.1986).[4] Further, the district court re-referred the consolidated preference actions to this court for resolution of the remaining issues.

---

plicable, the debt was incurred on the date of purchase of the SIBC investment certificate (as opposed to the maturity date); and (12) whether plaintiff is entitled to recover prejudgment interest from the date of first demand.

Plaintiff's request for summary judgment on the issue of insolvency, 11 U.S.C.A. § 547(b)(3) (West 1979), has previously been denied. His request for summary judgment on the § 547(b)(5) element is herewith denied.

Because the elements of § 547(b) have not been established, plaintiff's request for summary judgment on issues related to § 547(c) defenses is premature, and hence denied. Likewise, the request for summary judgment on the issue of prejudgment interest is premature and also denied.

**2.** Reference in this Memorandum to "defendants" or "the defendants" often means fewer than all of the defendants.

**3.** Section 109 of Title 11 of the United States Code enacts in part:

*Who may be a debtor*

. . . . .

(b) A person may be a debtor under chapter 7 of this title only if such person is not—
(1) a railroad;
(2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan association, building and loan association, homestead association, credit union, or industrial bank or similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit Insurance Act....

. . . . .

(d) Only a person that may be a debtor under chapter 7 of this title, except a stockholder or a commodity broker, and a railroad may be a debtor under chapter 11....

**4.** *See also The Morris Plan Company of Iowa,* 14 Bankr.Ct.Dec. (CRR) 665, 62 B.R. 348 (Bankr.N.D.Iowa 1986) (under Iowa law an industrial loan corporation is a business corporation instead of a bank).

## III

### *Constitutional Challenges to the Authority of the Bankruptcy Court*

Defendants assert two arguments challenging the authority of this court to adjudicate these preference actions. First, defendants contend this court lacks subject matter jurisdiction because it is not an Article III court. Secondly, defendants maintain subject matter jurisdiction is lacking because the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984), effected unconstitutional legislative appointments of bankruptcy judges in violation of U.S. Const. art. II, § 2, cl. 2.[5]

Former section 1471 of title 28 of the United States Code, a provision of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 241(a), 92 Stat. 2668 (1978), enacted in part:

*Jurisdiction*

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.

(c) The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.

When sued in bankruptcy court for alleged breaches of contract and warranty, misrepresentation and coercion, by a chapter 11 debtor, Marathon Pipe Line Co. sought dismissal on the basis that former § 1471 unconstitutionally conferred Article III judicial power upon the nation's bankruptcy judges.[6] Agreeing with Marathon's argument, a plurality of the Supreme Court concluded:

[T]he "adjunct" bankruptcy courts created by the Act exercise jurisdiction behind the facade of a grant to the district courts....

We conclude that 28 U.S.C. § 1471 ... has impermissibly removed most, if not all, of "the essential attributes of the judicial power" from the Art. III district court, and has vested those attributes in a non-Art. III adjunct. Such a grant of jurisdiction cannot be sustained as an exercise of Congress' power to create adjuncts to Art. III courts.

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 86–87, 102 S.Ct. 2858, 2879–2880, 73 L.Ed.2d 598 (1982).

Dissenting, Justice White maintained that a distinction the plurality sought to make in *Northern Pipeline* between claims based on state law and those derived from federal law disregarded the real character of bankruptcy proceedings.

[I]n the ordinary bankruptcy proceeding the great bulk of creditor claims are claims that have accrued under state law prior to bankruptcy—claims for goods sold, wages, rent, utilities, and the like.... The existence and validity of such claims recurringly depend on state law. Hence, the bankruptcy judge is constantly enmeshed in state-law issues.

---

5. [H]e [the President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for ... but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

6. U.S. Const. art. III, § 1 recites:

The judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

*Northern Pipeline*, 458 U.S. at 96–97, 102 S.Ct. at 2884 (White, J., dissenting).

Discussing the jurisdiction exercised by bankruptcy referees and judges prior to the 1978 Reform Act, the dissenting opinion recites:

> Furthermore, I take it that the Court does not condemn as inconsistent with Art. III the assignment of these functions—*i.e.*, those within the summary jurisdiction of the old bankruptcy courts—to a non-Art. III judge, since, as the plurality says, they lie at the core of the federal bankruptcy power. *Ante*, [458 U.S.] at 71 [102 S.Ct. at 2871]. They also happen to be functions that have been performed by referees or bankruptcy judges for a very long time and without constitutional objection. Indeed, we approved the authority of the referee to allow or disallow claims in *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). There, the referee held that a creditor had received a preference and that his claim could therefore not be allowed. We agreed that the referee had the authority not only to adjudicate the existence of the preference, but also to order that the preference be disgorged.

*Northern Pipeline*, 458 U.S. at 99, 102 S.Ct. at 2886 (White, J., dissenting).

The Court determined that its decision invalidating the grant of jurisdiction to the bankruptcy courts should apply prospectively only. Further, the Court stayed, and subsequently extended the stay of, its decision to "afford Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without impairing the interim administration of the bankruptcy laws." *Northern Pipeline*, 458 U.S. at 88, 102 S.Ct. at 2880.

In December 1982, after Congress failed to act prior to the Supreme Court's extended deadline for the stay of its decision, the Judicial Councils for the various circuits directed the district courts to adopt a model emergency rule.[7]

In a challenge to the constitutionality of the interim emergency rule, the Sixth Circuit found that the powers reserved by the district courts under the emergency rule—authority to revoke referral to the bankruptcy judge; authority to hold a hearing and receive evidence; and the choice to accept, reject, or modify the judgment of the bankruptcy judge after de novo review—"satisfy the Supreme Court's concern that Art. III courts adjudicate bankruptcy cases." *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254, 263 (6th Cir.1983).[8] The Sixth Circuit determined that the interim emergency rule did not conflict with either the holding in *Northern Pipeline* or Article III.

> The interim rule does not violate the Constitution because the district courts retain primary jurisdiction over all bankruptcy proceedings. The bankruptcy courts have only derivative jurisdiction. They do not operate under an exclusive grant of jurisdiction as in § 1471(c) but rather derive their jurisdiction from the district courts as under the Chandler Act. The district courts retain control and primary responsibility for the conduct of bankruptcy proceedings. The interim rule implants sufficient mechanisms in the existing system to ensure that bankruptcy cases are resolved through a constitutionally valid process.

*White Motor Corp.*, 704 F.2d at 263.

Administration of the national bankruptcy laws continued pursuant to the interim

---

7. See *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254, 265–67 (6th Cir.1983) for the text of the emergency resolution.

8. *Accord Lucas v. Thomas*, 765 F.2d 926, 929 (9th Cir.1985); *Wards Company v. Jonnet Dev. Corp. (In re Lafayette Radio Electronics Corp.)*, 761 F.2d 84, 89 (2d Cir.1985); *National Acceptance Co. of America v. Price (In re Colorado Energy Supply, Inc.)*, 728 F.2d 1283, 1287 (10th Cir.1984); *Coastal Steel Corp. v. Tilghman*

*Wheelabrator Ltd.*, 709 F.2d 190, 200 (3rd Cir. 1983), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983); *First Nat'l Bank v. Hansen*, 702 F.2d 728, 729 (8th Cir.1983), *cert. denied*, 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983); and *Braniff Airways, Inc. v. Civil Aeronautics Board*, 27 B.R. 231 (N.D.Tex.), *aff'd*, 700 F.2d 214 (5th Cir.), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983).

emergency rule until enactment of The Bankruptcy Amendments and Federal Judgeship Act of 1984. Pursuant to this Act, original and exclusive jurisdiction of all cases under title 11 of the United States Code lies in the district courts. 28 U.S.C.A. § 1334(a) (West Supp.1986). Further, the district courts have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C.A. § 1334(b) (West Supp.1986). Bankruptcy judges are "unit[s] of the district court to be known as the bankruptcy court[s]...." 28 U.S.C.A. § 151 (West Supp.1986). The district courts may refer to the bankruptcy judges "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11...." 28 U.S.C.A. § 157(a) (West Supp. 1986). Section 157 further provides in part:

*Procedures*

. . . . .

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred [by the district courts] ... and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to—

. . . . .

(F) proceedings to determine, avoid, or recover preferences....

. . . . .

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown.

28 U.S.C.A. § 157 (West Supp.1986).

Viewing § 157 as essentially a congressional enactment of the interim emergency rule, one court finds the holding in *White Motor Corp.* alone justifies rejection of the argument that a bankruptcy court is constitutionally prohibited from entering a final judgment in a core proceeding. *Baldwin-United Corp. v. Thompson,* 12 Bankr.Ct. Dec. (CRR) 913, 915, 48 B.R. 49 (Bankr.S.D. Ohio 1985). However, although under the emergency rule all matters were subject to de novo review, under § 157 only proposed findings and conclusions in a non-core proceeding objected to by a party are subject to de novo review by the district court. The standard for review by the district court of findings of fact in core proceedings and non-core proceedings in which the parties consent to entry of judgment by the bankruptcy judge is the traditional clearly erroneous standard. Fed.R.Bankr. 8013.

Questioning the difference between § 157(a) and former § 1471(c) invalidated by the Supreme Court's holding in *Northern Pipeline,* Professor Lawrence P. King observes that § 157(b)(1) and (2) in effect grant "broad and pervasive jurisdiction to the bankruptcy court, thereby calling into question the constitutional validity of the 1984 amendments under *Northern Pipeline.*" King, *Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984,* 38 Vand.L.Rev. 675, 687 (1985). Professor King further states: "It may even be that the grant of jurisdiction to the bankruptcy court over classic bankruptcy

actions to recover preferences and fraudulent transfers overreaches the guidelines set forth in the Supreme Court's decision in *Northern Pipeline." Id.* at 692.

The majority of the courts reaching the question of the constitutionality of § 157 have held that the statute is constitutional. *Production Steel, Inc. v. Bethlehem Steel Corp.,* 48 B.R. 841 (M.D.Tenn.1985); *Danning v. Lummis (In re Tom Carter Enterprises, Inc.),* 44 B.R. 605 (C.D.Ca.1984); *Nordberg v. Republic Nat'l Bank (In re Chase & Sanborn Corp.),* 51 B.R. 733 (Bankr.S.D.Fla.1985); *Firestone v. Dale Beggs & Associates (In re Northwest Cinema Corp.),* 49 B.R. 479 (Bankr.D.Minn. 1985). *Contra Associated Grocers of Nebraska Coop. v. Nabisco Bakers,* 46 B.R. 173 (Bankr.D.Neb.1985) (28 U.S.C. § 157(b)(2)(F) is unconstitutional and in direct violation of Article III), *rev'd,* 14 Bankr.Ct.Dec. (CRR) 945, 62 B.R. 439 (D.Neb.1986).

While Bankruptcy Judge Britton describes the question as "a close one," *In re Chase & Sanborn Corp.,* 51 B.R. at 734, Bankruptcy Judge Lee clearly thinks otherwise. See *L.T. Ruth Coal Co. v. Big Sandy Coal and Coke Co.,* 66 B.R. 753 (Bankr.E.D.Ky.1986) (28 U.S.C. § 157(b) is patently unconstitutional in its application and this court would so hold if not precluded by *Credithrift of America v. Lawson,* 52 B.R. 369 (E.D.Ky.1985)). In *L.T. Ruth Coal Co.,* a declaratory action involving lease rights under state law, Judge Lee states:

> There might be a modicum of difference constitutionally between wholesale reference of bankruptcy cases and proceedings to bankruptcy judges by statute under the Bankruptcy Reform Act of 1978 and by court order under the 1984 Act if Congress in good faith had made alternative provision for the handling of such cases and proceedings by the district courts so that reference might be truly discretionary. No such provision was made; wholesale reference by standing order was contemplated, and is an accomplished fact. To conclude there is a basis for distinction between wholesale reference by statute and by court order under such circumstances is to elevate fiction over fact. There is no difference constitutionally between this reference-by-court-order-charade and the reference-by-statute-charade [former 28 U.S.C. § 1471(c) ] struck down by the Supreme Court in the *Northern Pipeline* case.

*L.T. Ruth Coal Co.,* 66 B.R. at 787.[9]

Judge Lee's opinion in *L.T. Ruth Coal Co.* is consistent with the Supreme Court's holding in *Northern Pipeline.* His analysis of the issue of the jurisdiction of bankruptcy courts in matters involving *state law claims* in light of the holding in *Northern Pipeline* is cogent.[10] However, plaintiff's claims in the consolidated preference actions before this court do not arise under state law.

In a challenge to the constitutionality of an arbitration provision of the Federal Insecticide, Fungicide, and Rodenticide Act, the majority opinion demarcates the Supreme Court's narrow holding in *Northern Pipeline:*

> The Court's most recent pronouncement on the meaning of Article III is *Northern Pipeline.* A divided Court was unable to agree on the precise scope and nature of Article III's limitations. The Court's holding in that case establishes only that Congress may not vest in a non-Article III court the power to adju-

**9.** As to the district court's power to withdraw any reference, 28 U.S.C.A. § 157(d) (West Supp. 1986), Judge Lee notes that the power is an irrelevance in any case in which it is not exercised.

**10.** Judge Lee asks: "If the absolute right of traditional appellate review by an Article III court of a final adjudication by a non-Article III bankruptcy judge of a state-law based claim or cause of action does not meet the requirements of Article III, how can the existence of the mere possibility that an Article III court may be persuaded to withdraw any such proceeding from a non-Article III bankruptcy judge meet the requirements of Article III." *L.T. Ruth Coal Co.,* 66 B.R. at 789.

dicate, render final judgment, and issue binding orders in a *traditional contract action arising under state law*, without consent of the litigants, and subject only to ordinary appellate review.

*Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 3334–35, 87 L.Ed.2d 409 (1985) (emphasis added). Hence, the question of the jurisdiction of this court to adjudicate the consolidated preference actions, arising under 11 U.S.C.A. § 547 (West 1979), is outside the scope of the Court's holding in *Northern Pipeline*.

A leading bankruptcy treatise observes: "[T]here is considerable language [in *Northern Pipeline* ] which would lead one to conclude that avoiding actions, which are created by the Bankruptcy Code, can be heard and determined by a nontenured judge." 1 *Collier on Bankruptcy* ¶ 3.01 at 3–36 (15th ed. 1986) (footnote omitted). The language referred to is found in the plurality opinion:

> But when Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created.

*Northern Pipeline*, 458 U.S. at 83, 102 S.Ct. at 2877 (footnote omitted).

In *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), the Supreme Court decided that a bankruptcy referee had authority to determine the existence of a preference and to order disgorgement in the process of ruling on claims in a bankruptcy case. If that authority did not violate Article III this court may likewise adjudicate preference actions, even though a preference defendant may not have filed a claim. For if a preference defendant is constitutionally entitled to an initial determination by an Article III judge, that right could not be extinguished as a consequence of filing a claim in the bankruptcy case.[11] Accordingly, 28 U.S.C.A. § 157(b)(2)(F) (West Supp.1986) is not unconstitutional. *Cf. Commodity Futures Trading Comm'n v. Schor*, —— U.S. ——, 106 S.Ct. 3245, 3256, 92 L.Ed.2d 675 (1986) (Article III does not confer on litigants an absolute right to plenary consideration of every nature of claim by an Article III court).

The question remains whether this court lacks subject matter jurisdiction due to an allegedly unconstitutional appointment. Defendants contend that sections 106(a) and 121(e) of the Bankruptcy Amendments and Federal Judgeship Act of 1984 effect appointments of bankruptcy judges in a manner proscribed by, and "plainly inconsistent" with, the Appointments Clause.[12]

Section 404(b) of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2683 (1978), enacted in part:

> (b) The term of a referee in bankruptcy who is serving on the date of enact-

---

**11.** The court recognizes that Article III is not discussed in *Katchen v. Landy*. Further, the plurality opinion in *Northern Pipeline* recites:

> [W]hen *Katchen* was decided the 1973 Bankruptcy Rules had not yet been adopted, and the district judge, after hearing the report of [the] magistrate, was free to "modify it or ... reject it in whole or in part or ... receive further evidence or ... recommit it with instructions." General Order in Bankruptcy No. 47, 305 U.S. 702 (1939).

*Northern Pipeline*, 458 U.S. at 79 n. 31, 102 S.Ct. at 2875 n. 31.

However, the Court omits the first sentence of General Order in Bankruptcy No. 47, which

provides: "Unless otherwise directed in the order of reference the report of a referee ... shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous." This is also the current standard of review. Fed.R.Bankr. 8013. Further, the district court's authority on appeal to modify or reverse the judgments and orders of this court is not diminished from the previous authority under General Order in Bankruptcy No. 47.

**12.** See note 5, *supra.*

ment of this Act is extended to and expires on March 31, 1984 or when his successor takes office. During the period commencing on October 1, 1979, and ending on March 31, 1984 (hereinafter in this title referred to as "the transition period"), unless such referee is found to be not qualified by the Chief Judge of the Circuit Court after consultation with a merit screening committee established as provided in subsection (c) of this section, such a referee in bankruptcy upon the expiration of his appointed term as referee shall have the title of United States bankruptcy judge, and shall serve in the court of bankruptcy continued under subsection (a) of this section that appointed such United States bankruptcy judge, in the manner prescribed by this title.

Prior to enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress amended section 404(b) four times in 1984 to extend the term of service. (June 27, 1984, was the final expiration date.) See *Production Steel, Inc. v. Bethlehem Steel Corp.*, 48 B.R. 841, 847 (M.D.Tenn.1985). However, the President did not sign the Bankruptcy Amendments and Federal Judgeship Act of 1984 until July 10, 1984, thirteen days after expiration of the "transition" period.

Section 152 of title 28 of the United States Code, as amended by the 1984 Bankruptcy Amendments and Federal Judgeship Act, provides for appointment of bankruptcy judges by the circuit courts of appeal. Section 106(a) of the 1984 Act enacts:

Notwithstanding section 152 of title 28, United States Code, as added by this Act, the term of office of a bankruptcy judge who is serving on the date of enactment of this Act is extended to and expires four years after the date such bankruptcy judge was last appointed to such office or on October 1, 1986, whichever is later.

Section 121(b) of the Act provides for the amendment of section 404(b) of the 1978 Bankruptcy Reform Act to strike "June 27, 1984" each place it appears and to substitute therefor "the day before the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984." Section 121(e) recites: "The term of office of any bankruptcy judge who was serving on June 27, 1984, is extended to and shall expire at the end of the day of enactment of this Act."

■ Defendants contend the term of office of the bankruptcy judges expired on June 27, 1984, and that Congress has appointed bankruptcy judges in violation of the Appointments Clause. These contentions were thoroughly considered and rejected in *In re Benny*, 44 B.R. 581 (N.D.Ca. 1984), *appeal dismissed*, 14 Bankr.Ct.Dec. (CRR) 901, 791 F.2d 712 (9th Cir.1986). This court concurs in the *Benny* court's conclusion that the term of office of bankruptcy judges continued until enactment of the 1984 bankruptcy amendments on July 10, 1984, by virtue of the holdover provision of section 404(b) of the 1978 Bankruptcy Reform Act.

As officeholders on July 10, 1984, pursuant to the holdover provisions of prior law, the bankruptcy judges were properly continued in office, by Section 106(a), without reliance on any retroactive application of Section 121(e) of the 1984 Act.

*In re Benny*, 44 B.R. at 586. *Accord Robison v. First Fin. Capital Management Corp. (In re Sweetwater )*, 55 B.R. 724 (D. Utah 1985); *Production Steel, Inc. v. Bethlehem Steel Corp.*, 48 B.R. 841 (M.D. Tenn.1985).

■ Assuming there was a hiatus,[13] this court further agrees with the *Benny* court's determination that sections 106(a) and 121(e) permissibly extend the bankruptcy judges' terms retroactively and do not effect invalid legislative appointments.

Congress did not select, and therefore did not "appoint", any one or all of the

---

**13.** See *Danning v. Lummis (In re Tom Carter Enterprises, Inc.)*, 44 B.R. 605 (C.D.Ca.1984) (although office of bankruptcy court expired on June 27, 1984, Congress' interim extension of the tenure of incumbent bankruptcy judges is constitutional).

bankruptcy judges now in office. Rather, Congress modified the terms of office and nature of office of all bankruptcy judges previously appointed by the district courts who were in office as of June 27, 1984. By selecting no one to be added to, or subtracting from, the bankruptcy judges in office on June 27, Congress filled no vacancy—and created no vacancy—in the office of bankruptcy judge.

*In re Benny,* 44 B.R. at 589 (footnote omitted).

Extension of the term of service of the bankruptcy judges pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984 does not violate the Appointments Clause.

## IV

### *Lack of Notice of Bankruptcy Proceedings*

Defendants contend the trustee should be estopped and the complaints dismissed because they did not have notice and an opportunity to participate in the proceedings resulting in confirmation of the SIBC plan of reorganization.[14] Plaintiff responds this fact does not bar the preference actions.[15]

Defendants assert they were identified as potential preference defendants as early as June 15, 1983 (more than five months prior to the confirmation hearing) when trustee Deutscher filed his Preliminary Valuation Report. Observing that the disclosure statement provides that enforcement of preference actions by the liquidating trustee is crucial to successful effectuation of the plan, defendants insist they were entitled to notice of the SIBC proceedings. Asserting the SIBC schedules should have been amended to include them as creditors and assure notice to them of the

proceedings in the SIBC case, defendants contend that they have been denied due process.

Plaintiff maintains no notice was due because defendants were not "creditors" when SIBC filed its petition and that defendants did not have a "claim" when the court confirmed the SIBC plan. Citing Fed.Bankr.R. 2002(b), plaintiff notes that only the debtor, the trustee, creditors, and indenture trustees are entitled to notice of the disclosure statement and confirmation hearings. Further, Fed.Bankr.R. 3017(d) provides for notice only to creditors and equity security holders of the confirmation hearing date and the time within which acceptances or rejections may be filed. Further, plaintiff maintains that even if the defendants were creditors they are nonetheless bound by the terms of the SIBC confirmed plan. *Evans v. Dearborn Mach. Movers Co.,* 200 F.2d 125 (6th Cir.1953) (consummated reorganization plan binding even against creditors not scheduled and not aware of proceedings).

In the Bankruptcy Code "creditor" means:

> (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;
>
> (B) entity that has a claim against the estate of a kind specified in section ... 502(h) ... of this title....

. . . . .

11 U.S.C.A. § 101(9) (West 1979).

"Claim" means in relevant part: "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed...." 11 U.S.C.A. § 101(4)(A) (West 1979). Section 502(h) of the Bankruptcy Code enacts: "A claim arising from the recovery of property

---

**14.** Alternatively, defendants maintain that if the payments to them were preferences their resulting claims are nondischargeable, because the lack of notice denied them due process and equal protection required by the Constitution. Since it remains to be determined whether de-

fendants received preferences, the court does not reach these constitutional questions.

**15.** According to plaintiff a small number of the defendants received notices in the SIBC case because they held claims unrelated to the preference claims on the petition date.

under section ... 550 [Liability of transferee for avoided transfer [16] ] ... of this title shall be determined, and shall be allowed ... of disallowed ... the same as if such claim had arisen before the date of the filing of the petition." 11 U.S.C.A. § 502(h) (West 1979).

Defendants maintain that the causes of action against them to recover alleged preferences arose upon the filing of SIBC's bankruptcy petition. Defendants contend that simultaneously therewith, and as a consequence of the creation of the causes against them, contingent, unliquidated claims arose in their favor making them creditors of SIBC as of the petition date. Defendants further maintain that if the plaintiff recovers from them they will qualify as creditors under 11 U.S.C.A. § 101(9)(B) (West 1979)—their claims arising by reason of recovery of avoided preferences—and that their claims will be deemed prepetition claims. 11 U.S.C.A. § 502(h) (West 1979). Hence, defendants insist they are creditors under § 101(9) and as such that they were entitled to notice of the SIBC proceedings.

Defendants contend that *Dearborn Mach. Movers*, which involved a creditor with actual knowledge of his debtor's reorganization proceedings, is superseded by *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953). In *City of New York*, New York City held liens on property of the debtor railroad. The reorganization court entered an order fixing a bar date for filing claims. A copy of this order was published in five daily newspapers. The debtor railroad did not send a copy of the bar order to New York City, despite knowledge of the city's lien claims. The city's lien claims were never filed in the reorganization proceeding. When the city sought to enforce its liens, the railroad, contending the city's claims were barred, obtained an injunction in district court. The Supreme Court held that publication of the bar order was not reasonable notice to New York City under the circumstances of the case. The Court's opinion recites in part:

> Nor can the bar order against New York be sustained because of the city's knowledge that reorganization of the railroad was taking place in the court. The argument is that such knowledge puts a duty on creditors to inquire for themselves about possible court orders limiting the time for filing claims. But even creditors who have knowledge of a reorganization have a right to assume that the statutory "reasonable notice" will be given them before their claims are forever barred.

*City of New York*, 344 U.S. at 297, 73 S.Ct. at 301.

Defendants also rely upon *In re Harbor Tank Storage Co.*, 385 F.2d 111 (3rd Cir. 1967) and *Reliable Elec. Co. v. Olson Constr. Co.*, 726 F.2d 620 (10th Cir.1984). In *Harbor Tank Storage* the court concluded that a creditor has a right to file and prove a claim postconfirmation, and subsequent to the bar date for filing claims, where the bankruptcy trustee has actual knowledge of the claim but does not give any of the required notices related to reorganization. *Reliable* involved an identifiable but unscheduled creditor with actual knowledge of the debtor's reorganization proceedings. (The debtor's attorney informed the creditor's attorney of the bankruptcy filing during a telephone conversation.) The creditor did not, however, receive any formal notice of the proceedings in the debtor's case. After observing that the creditor was entitled to expect formal notification of the confirmation hearing, the court held that the absence of an opportunity for the creditor to comment on the reorganization plan (which was confirmed)

---

**16.** Section 550 of the Bankruptcy Code recites in part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547 ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made. ...

11 U.S.C.A. § 550(a) (West 1979).

violated due process requirements. Further, the court held that, notwithstanding 11 U.S.C.A. § 1141 (West 1979) (Effect of Confirmation), discharge of a claim without reasonable notice of the confirmation hearing violates the Fifth Amendment. The opinion concludes:

> [T]he notice by Reliable to Olson was deficient ... Olson's claim cannot be bound to the Plan and, thus, it is not dischargeable.
>
> .... We will not require Olson to subject its claim to a confirmed reorganization plan that it had no opportunity to dispute.

*Reliable,* 726 F.2d at 623 (footnote omitted).

In *Bank of Commerce v. Freels (In re Southern Indus. Banking Corp.),* 46 B.R. 306 (Bankr.E.D.Tenn.1985), this court stated:

> [A]t issue is whether creditors who had actual knowledge of the debtor's reorganization case, but who were given none of the requisite notice or documentation concerning the proceedings and applicable deadlines, may be barred by the discharge arising upon confirmation of the debtor's plan of reorganization from proceeding with the state court action and ultimately filing their claim with the bankruptcy court.

*Freels,* 46 B.R. at 307.

This court determined that the creditors were not barred from pursuing their state court action and, if successful, filing their claim in the SIBC case.

The claims at issue in *City of New York, Harbor Tank Storage, Reliable,* and *Freels* differ materially from the rights defendants assert as claims. None of the creditors in those cases asserted a claim contingent upon, or arising as a result of, the exercise of an avoidance power in bankruptcy. Instead, each of the four cases involved an identifiable creditor with a claim actually arising prepetition.

"Claim" is broadly defined in § 101(4) to assure the debtor a fresh start. See H.R. Rep. No. 595, 95th Cong., 1st Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5963, 6266. Congress wanted to assure that a debtor be able to obtain "the broadest possible relief in the bankruptcy court." *Id.* However, in a reorganization case involving an application for the appointment of a legal representative to represent the interests of individuals who may manifest asbestos-related diseases in the future, in denying the application, the court observed that: "It is not true that any conceivable claim is contingent." *In re UNR Industries, Inc.,* 29 B.R. 741, 745 (N.D.Ill.1983), *appeal dismissed,* 725 F.2d 1111 (7th Cir.1984).

Sustaining defendant's contention that they are creditors within the scope of § 101(9)(A) would mean that prepetition transferees of transfers avoidable under §§ 544, 545, 547, 548, and 553 are entitled to notice and, presumably, to all the rights available to creditors in bankruptcy.[17] Formal notice of bankruptcy proceedings to potential preference defendants has never been customary and perhaps never considered previous to this case. This court is confident that neither Congress nor the Bankruptcy Rules Committee envisioned formal notice of bankruptcy proceedings to transferees of avoidable transfers or their participation in reorganization proceedings until disgorgement of the avoidable transfer. The defendants' prospective rights to file claims, § 502(h), are not contingent claims within the circumscription of § 101(4)(A). Hence, the defendants are not "creditors" within the scope of § 101(9)(A). Further, defendants do not qualify as creditors under § 101(9)(B) because to date there has been no recovery of property from them pursuant to § 550. See § 502(h) (a claim arising *from the recovery of property* under § 550 shall be allowed or disallowed as if such claim had arisen prepetition).

---

17. But see 11 U.S.C.A. § 502(d) (West 1979) (court shall disallow any claim of any entity from which property is recoverable under section 550 unless the entity has paid the amount or turned over the property for which such entity is liable).

Defendants contend that even if they are not creditors they were nonetheless entitled to formal notice of the SIBC bankruptcy proceedings because they are parties in interest. They note that a party in interest "may raise and may appear and be heard on any issue in a case under ... chapter [11]," 11 U.S.C.A. § 1109(b) (West 1979), and that a party in interest may object to confirmation of a plan. 11 U.S.C.A. § 1128(b) (West 1979). Defendants maintain that the right to be heard is of little worth unless informed of a pending matter. See *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

■ Assuming arguendo that defendants are parties in interest, lack of formal notice to them of the SIBC proceedings does not bar plaintiff's claims. Formal notice of a debtor's bankruptcy proceedings is not a condition precedent to pursuit of a preference action against a party in interest.

## V

### *Effect of Prepetition Fraud*

Plaintiff contends that the alleged prepetition fraud of SIBC is not a defense to his preference actions. Contending SIBC obtained their money by various fraudulent acts, defendants assert a constructive trust arose prepetition and that their money thus never became property of SIBC. Alternatively, defendants contend their agreements with SIBC were void ab initio due to fraud. For the purpose of ruling on plaintiff's motion for partial summary judgment the court assumes that the defendants were defrauded.

*Boyle v. Wells (In re Gustav Schaefer Co.)*, 103 F.2d 237 (6th Cir.1939), *cert. denied*, 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939), involved a bankruptcy trustee's objection to claims for unpaid personal property tax assessments against the bankrupt. The assessments were based on returns filed by the bankrupt. When the trustee filed an objection on the basis that the claims were excessive, the claimant argued that the trustee should be estopped from challenging the assessments. Disagreeing, because there was not privity between the trustee and the bankrupt, the court found no basis for estoppel.

The trustee represents the general creditors and in this capacity may assert claims, *avoid preferences* and collect assets where the bankrupt, if bankruptcy had not intervened, would be estopped. *Boyle*, 103 F.2d at 241 (citation omitted and emphasis added).

■ Although this statement is dictum, a trustee's right to avoid a preference is clearly not a personal action, such as an action for breach of a contract to which the debtor is a party. Exercising an avoidance power as a representative of the estate, the trustee does not stand in the shoes of the debtor.[18]

In *Harvey Hooper Lobsters, Ltd. v. Best Pack Seafoods, Inc.*, 29 B.R. 23 (Bankr.D. Me.1983) the trustee sought to avoid an attachment as preferential. As an affirmative defense, the creditor asserted fraud on the part of the debtor and its sole shareholder. Rejecting the defense, the court stated:

When a trustee seeks to assert a debtor's cause of action against a third party the trustee stands in the debtor's shoes and is subject to all valid claims and defenses, including inequitable conduct, which the third party has against the debtor. When seeking to avoid a preferential transfer, however, the trustee is not asserting a cause of action belonging to the debtor but asserting an action in a representative capacity for general unsecured creditors. As stated by the court in *Teiger v. Stephen Oderwald, Inc.*, 31 F.Supp. 626, 627 (S.D.N.Y.1940) (citations omitted), "[i]n an action to recover a preference, representations made by the bankrupt are not material.... In re-

---

18. See *Schneider v. O'Neal*, 243 F.2d 914, 918 (8th Cir.1957) (trustee stands in the "overshoes of the creditors").

spect to the representations, there is no privity between the trustee and the bankrupt and the doctrine of estoppel is inapplicable to the trustee."

*Best Pack Seafoods*, 29 B.R. at 24–25 (citations omitted). *Accord Faircloth v. Paul (In re International Gold Bullion Exch., Inc.)*, 60 B.R. 261 (Bankr.S.D.Fla.1986) (fraud by debtor does not impair trustee's rights under § 547).

In obtaining a $985,000.00 loan, the debtor in *Gower v. Farmers Home Admin. (In re Davis)*, 785 F.2d 926 (11th Cir.1986) defrauded FmHA. Finding the trustee's claim tainted by the debtor's fraud, the district court reversed a judgment of the bankruptcy court in favor of the trustee, whose complaint asserted rights under §§ 544 and 547. The court of appeals reversed, stating:

> Since the trustee's claims are for the benefit of the creditors, the fraud of the bankrupt does not require them to be forfeited.

*In re Davis*, 785 F.2d at 927. *Contra Heyman v. Kemp (In re Teltronics, Ltd.)*, 649 F.2d 1236, 1239 (7th Cir.1981) (property obtained by fraud is not part of the bankrupt's estate); *Nicklaus v. Bank of Russellville*, 336 F.2d 144, 146 (8th Cir.1964) (bankruptcy trustee has no interest in property acquired by the fraud of the bankrupt); *Manly v. Ohio Shoe Co. (In re Baltimore Shoe House, Inc.)*, 25 F.2d 384, 385 (4th Cir.1928) (general creditors have no right to profit from fraud of the bankrupt at the expense of one deceived and defrauded). *See also Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1015 (5th Cir.1985) (§ 544 does not authorize a bankruptcy trustee to retain for benefit of estate property obtained through the fraud of the debtor upon which state law has imposed a valid constructive trust).

In *Manly v. Ohio Shoe*, finding that the bankrupt obtained goods while hopelessly insolvent and without reasonable expectation of paying for them, the court permitted the seller to disaffirm the sale and retake the goods.

> Where goods are obtained by fraud of the bankrupt, the seller may rescind the contract of sale and reclaim them if he can identify them in the hands of the trustee. This is on the theory that fraud renders all contracts voidable, and that neither in law nor in morals would the trustee be justified in holding goods obtained by the fraud of the bankrupt for the benefit of other creditors. Such creditors have no right to profit by the fraud of the bankrupt to the wrong and injury of the party who has been deceived and defrauded. This does not result in a preference in favor of the seller who thus retakes goods obtained from him by fraud, because in such case the seller retakes his own property which he must be able to identify.

*Manly v. Ohio Shoe*, 25 F.2d at 385 (citations omitted).

While agreeing that creditors generally should not benefit at the expense of those defrauded by the debtor, equity demands otherwise where the creditors are victims of the same fraud. The bankruptcy trustee in *Merrill v. Abbott (In re Independent Clearing House Co.)*, 41 B.R. 985 (Bankr.D. Utah 1984), filed two thousand adversary complaints, against investors in a "Ponzi"[19] scheme, to recover alleged preferences and fraudulent transfers. Defendant transferees maintained the funds the trustee sought to recover were impressed with a constructive trust and never became property of the debtors' consolidated estate. Bankruptcy Judge Allen noted an important distinction between the avoidance proceedings in *Independent Clearing House* and cases such as *In re Teltronics* and *Nicklaus v. Bank of Russellville*, involving identifiable property composing a trust res. The same distinction exists in the instant proceedings where, as in *Independent Clearing House*, the monies at issue are not on hand. Declining to retroactively validate transfers of unidentifiable

---

**19.** The financial scheme employed by Charles Ponzi and the remarkable response by investors is reported in *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

funds—the defendants' investments were commingled with other funds—because doing so would operate detrimentally against other equally innocent investors, not against the fraudulent debtors, Judge Allen concluded:

> The defendants did not rescind their contracts but accepted monthly payments in accordance with the express terms thereof. When we stop to consider the injustice that would result if a constructive trust were erected in the manner urged by defendants, we instantly see that a court of equity would never sanction such an act. If this Court were to hold that a debtor's fraud nullified the trustee's avoiding powers, a basic purpose of the bankruptcy law would be thwarted. Preferential and fraudulent transfers would be allowed to stand and certain favored creditors would reap the benefit of the debtor's wrongdoing.

*Independent Clearing House*, 41 B.R. at 1004. *Accord Research-Planning, Inc. v. Segal (In re First Capital Mortgage Loan Corp.)*, 60 B.R. 915, 918 (Bankr.D. Utah 1986). *See also Torres v. Eastlick (In re North American Coin & Currency, Ltd.)*, 767 F.2d 1573, 1575 (9th Cir.1985) (ratable distribution among creditors is one of the strongest policies behind the bankruptcy laws), *cert. denied,* —— U.S. ——, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986).

In *Edmondson v. Bradford-White Corp.* (*In re Tinnell Traffic Services, Inc.*), 41 B.R. 1018 (Bankr.M.D.Tenn.1984), the debtor obtained $53,114.83 from the defendant through the use of false freight bill and invoice lists. Repenting, less than ten days later, the debtor informed the defendant of the fraud and made restitution. Bankruptcy ensued and the debtor's trustee sought to avoid the debtor's restitutionary payment as a preference. Defendant contended: (1) it merely received a return of its own property; and (2) since the debtor obtained the property through fraud, the debtor held the property in constructive trust as trustee for the defendant. Bankruptcy Judge Paine determined that in the absence of a judicial decree imposing a constructive trust the property used to

make the restitutionary transfer was property of the debtor. Further, Judge Paine declined to impose a constructive trust:

> [T]he debtor engaged in a fraudulent scheme in which approximately 10 to 15 creditors were induced to pay the debtor on the basis of false freight bills and invoices. These defrauded customers are unsecured creditors of this bankruptcy estate. To allow the defendant in this case to receive funds paid to the debtor under a constructive trust theory would be detrimental to these unsecured creditors. This court can find *no reason to treat the defendant any differently from all the other defrauded creditors* in this estate and will not impose a constructive trust for the defendant's benefit.

*In re Tinnell Traffic Services*, 41 B.R. at 1021–22 (emphasis added and footnote omitted).

 Accepting defendants' assertions of fraud as true, hundreds of other investors with claims against SIBC were likewise defrauded. Defendants did not rescind their agreements with SIBC. Instead, they obtained payments—dollar for dollar—in exchange for the surrender of their investment certificates. Those payments were made with monies that were the property of SIBC. Retrospective imposition of a constructive trust insulating those payments from avoidance is contrary to the cardinal bankruptcy policies of equality of distribution and discouragement of a race to dismember a debtor during the slide into bankruptcy. Under the circumstances equitable considerations clearly do not warrant imposing a constructive trust. To the contrary, if the defendants have received avoidable preferences equality between them and the other investors with claims against the SIBC estate is equity.

There is some similarity between these actions and *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), where the trustees in bankruptcy of Charles Ponzi sought to recover alleged preferences. Borrowing against only his

personal 90–day notes, issued for 150% of the amount borrowed, Ponzi took in $9,582,000.00 in eight months. After a Boston newspaper published a report that Ponzi was hopelessly insolvent, investors demanded the return of their money. Defendants obtained payment shortly before Ponzi's bankruptcy petition was filed. The lower courts accepted defendants' argument that they had rescinded for fraud and that payments to them merely represented a return of their own money. Disagreeing, the Supreme Court found the payments were preferences even if it assumed defendants had rescinded for fraud, because it was impossible for defendants to trace their funds.

In such a case, the defrauded lender becomes merely a creditor to the extent of his loss and a payment to him by the bankrupt within the prescribed [preference] period ... is a preference.

. . . . .

Whether they sought to rescind, or sought to get their money as by the terms of the contract, they were, in their inability to identify their payments, creditors, and nothing more. It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt[cy] law.

*Cunningham v. Brown*, 265 U.S. at 12–13, 44 S.Ct. at 426–427.

Although this court does not reach the issue, it appears tracing would likewise be an insurmountable obstacle for defendants. See *Brennan v. Tillinghast*, 201 Fed. 609, 615 (6th Cir.1913) (depositor may rescind contract of deposit and reclaim amount deposited if traced into assets of the bank coming into the hands of the receiver where the bank accepted the deposit while hopelessly insolvent); *Henderson v. Allred (In re Western World Funding, Inc.)*, 54 B.R. 470, 475 (Bankr.D.Nev.1985) (retroactive imposition of constructive trust denied where funds commingled and creditors did

not attempt to trace beyond their original deposit).[20]

## VI

### *Standing of the Plaintiff Liquidating Trustee and Benefit to Creditors from Recovery*

Certain defendants contend that (1) plaintiff lacks standing to pursue these preference actions, and (2) the recovery sought will not be distributed equally among the creditors of SIBC. This court previously considered and rejected these contentions in denying a motion to dismiss in *DuVoisin v. East Tennessee Equity, Ltd. (In re Southern Industrial Banking Corp.)*, 59 B.R. 638 (Bankr.E.D.Tenn.1986).

Article VI of the confirmed plan expressly provided for the appointment of a liquidating trustee as the representative of the estate to recover certain assets:

Upon the Confirmation Date, the Liquidating Trustee shall be appointed representative of the estate and deemed vested with any and all rights and powers conferred on a trustee in a case under Chapter 11 of the Bankruptcy Code in respect to the Liquidation Assets, pursuant to, *inter alia*, § 1123(b)(3)(B) of the Bankruptcy Code. Accordingly, the Liquidating Trustee shall retain and be empowered to enforce any claim or interest comprising the Liquidation Assets including, but not limited to, the power to avoid transfers under ... § 547 ... and to recover ... property so transferred.

Section 1123 of title 11 of the United States Code enacts in part:

. . . . .

(b) Subject to subsection (a) of this section, a plan may—

. . . . .

(3) provide for—

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

---

**20.** *Heyman v. Kemp (In re Teltronics, Ltd.)*, 649 F.2d 1236 (7th Cir.1981), recognizing an exception to the tracing rule, is distinguishable be-

cause the defrauded customers in that case would receive equal treatment by sharing in the fund in the receiver's possession.

(B) the retention and enforcement by the debtor, by the trustee, *or by a representative of the estate appointed for such purpose, of any such claim* or interest. . . .

11 U.S.C.A. § 1123 (West 1979) (emphasis added).

■ Pursuant to § 1123(b)(3) plaintiff has standing to enforce preference actions in accordance with the terms of the confirmed plan of reorganization. *Texas Consumer Fin. Corp. v. First Nat'l City Bank*, 365 F.Supp. 427 (S.D.N.Y.1973), holding that the power to avoid a preference is nonassignable, is readily distinguishable:

> *Texas Consumer Finance* did not involve the question of the retention and enforcement of an action under § 1123(b) or its predecessor. There the court merely held that a plan of arrangement could not "assign" causes of action for preference recoveries to a designee of a creditors' committee. The court specifically noted the assignee's lack of "statutory authority to sue." 365 F.Supp. at 430. This [the SIBC plan] is not such an' assignment, and there is here no such lack of statutory authority.

*DuVoisin v. East Tennessee Equity, Ltd.*, 59 B.R. at 642.

■ As to the contention that recovery will not equally benefit creditors, the simple answer is that it need not. The plan permissibly provides for different treatment of different classes of claims. 11 U.S.C.A. § 1123(a) and (b) (West 1979). Recovery, if any, of the alleged preferences will benefit unsecured creditors whose claims were impaired. Those creditors received either actual shares of stock or rights to purchase the stock of the successor-in-interest, or both. As previously recognized by this court:

[T]o the extent that plaintiff [DuVoisin's] recovery of . . . preferences operates to increase the assets and financial health of the successor-in-interest, it also operates to proportionally increase the value of those ownership rights in the successor-in-interest which constitute a portion of the unsecured creditors' distribution under the plan.[5]

*DuVoisin v. East Tennessee Equity, Ltd.*, 59 B.R. at 641.[21]

## VII

### *Laches or Waiver*

Because the preference actions were filed postconfirmation, defendants contend there has been an undue delay and that plaintiff is barred by either the doctrine of laches or waiver. Discussing the doctrine of laches in a preference action commenced after a chapter 7 debtor's reaffirmation of a debt to a lender with an unperfected security interest, Bankruptcy Judge Lundin wrote:

> Laches is an equitable doctrine that constitutes a *"quasi* statute of limitations." The essence of the defense is that a party has unreasonably and prejudically delayed asserting a cause of action. Application of laches is committed to the discretion of the court. However, laches is inappropriate when a specific statute of limitation is provided by applicable law.

*Edmondson v. Mandrell*, 39 B.R. 455, 459 (Bankr.M.D.Tenn.1984) (citations omitted).

■ Because 11 U.S.C.A. § 546(a) (West 1979)[22] fixes the limitation period for avoiding preferences, the doctrine of laches is inapplicable in this consolidated action. *Cf. Korvettes, Inc. v. Sanyo Electric, Inc.*, 42 B.R. 217 (Bankr.S.D.N.Y.1984) (doctrine of laches barred preference action filed by debtor-in-possession more than two years

---

**21.** Footnote 5 recites: "Furthermore, to the extent that recovery of preferences . . . increases the assets of the successor-in-interest and reduces the successor-in-interest's need to draw on the Reserve Fund, creditors holding Contingent Interest Certificates will benefit by having the likelihood or amount of a distribution to them increased." 59 B.R. at 641 n. 5.

**22.** An action or proceeding under section . . . 547 . . . may not be commenced after the earlier of—

(1) two years after the appointment of a trustee . . . and

(2) the time the case is closed or dismissed.

after commencement of its bankruptcy case).

 Waiver involves an intentional, voluntary relinquishment of a claim or right. No basis exists to find a waiver by the plaintiff in these actions. Where any recovery benefits creditors, albeit indirectly, postconfirmation filing is not a bar. Indeed, postconfirmation pursuance of the preference actions is an integral element of the confirmed plan of reorganization.

## VIII

### Conformity with Confirmed Plan

 Defendants who received payments against matured investment certificates during the preference period contend plaintiff's attempt to recover from them is contrary to the amended disclosure statement and confirmed plan. These defendants seek summary judgment dismissing the complaints against them.

Citing the SIBC Preliminary Valuation Report, filed June 15, 1983, defendants maintain that trustee Deutscher never intended to seek recovery from non-insider investors who received payment against investment certificates that matured during the preference period.[23] Schedule 9 of the report recites in part:

SOUTHERN INDUSTRIAL BANKING CORPORATION
PRIMA FACIE PREFERENTIAL PAYMENTS
AS OF MAY 31, 1983

| | AMOUNT DISCOVERED | LIQUIDATION VALUE |
|---|---|---|
| EARLY REDEMPTION OF INVESTMENT CERTIFICATES (1) | 12,698,108.08 | 7,618,864.85 |
| TRADE PREFERENCES (2) | 1,806,053.10 | 903,026.55 |
| | $14,504,161.18 | $8,521,891.40 |

(1) PAYMENTS MADE TO HOLDERS OF CERTIFICATES FOR EARLY WITHDRAWAL OF THEIR DEPOSITS DURING 90 DAYS PRECEDING BANKRUPTCY PETITION. THE ESTIMATED RECOVERY IS 60% OF PAYMENTS DISCOVERED.

(2) PAYMENTS MADE TO VENDORS AND SUPPLIERS FOR ANTECEDENT DEBT, DURING 90 DAYS PRIOR TO BANKRUPTCY PETITION. THE ESTIMATED RECOVERY IS EXPECTED TO BE 50% OF PAYMENTS DISCOVERED.

---

The same description of preferences and identical figures are reflected in the SIBC Asset Liquidation Analysis, Exhibit 1 to the amended disclosure statement, approved by this court on October 31, 1983. Further, the Asset Liquidation Analysis lists as "Contingent Assets:"

A. Prima Facie Preferential Payments

1. Early Redemption of Investment Certificates

2. Trade Preferences

No mention is made of other preference recoveries in the Asset Liquidation Analysis schedule.

Defendants also observe that the discussion of preferences in section VI of the amended disclosure statement provides in part:

These transfers include early redemptions by creditors of Investment Certificates, i.e., prior to face maturity date, and payments made during the ninety-day period to trade creditors. The results of this [preferential analysis] re-

---

23. In an attempt to establish trustee Deutscher's intent, defendants also rely upon the affidavits of Willard N. Albert, Sr. and Ben Garrett, submitted with a brief filed by Stophel, Caldwell & Heggie, P.C. on June 20, 1985. (Wagner & Myers, P.C. has been substituted for the Stophel firm.) However, these affidavits are inadmissible hearsay.

view [by trustee Deutscher] indicate an aggregate, at book value as of September 27, 1983, of $12,698,108.08 of early redemptions of Investment Certificates and an aggregate of $1,806,053.10 of payments made to trade creditors within the ninety (90) days that the Trustee believes may meet the test of a preferential transfer....

Some defendants who redeemed matured investment certificates during the preference period, but had other claims against SIBC on the petition date, insist they voted in favor of the SIBC plan because they thought the payments they had received on matured investment certificates were outside the scope of preference recoveries proposed under the reorganization plan. Considering the figures reported and the description of preferences in the amended disclosure statement, defendants maintain the plaintiff is estopped to pursue recovery of payments made by SIBC during the preference period against matured investment certificates. According to defendants, the early redemption of investment certificates and trade preferences are the only preference recoveries envisioned by the confirmed plan and the amended disclosure statement.

The following, and no other, language is printed in boldface type on page ii of the amended disclosure statement as printed and mailed to creditors:

PERSONS AGAINST WHOM SOUTHERN INDUSTRIAL BANKING CORPORATION HAS A PREFERENCE CLAIM FOR WITHDRAWAL OF FUNDS AFTER DECEMBER 10, 1982 ARE ENCOURAGED TO REFUND THE FULL AMOUNT SO WITHDRAWN; SUCH PERSONS WILL BE ENTITLED TO FILE A CLAIM AND BECOME A CREDITOR.

Section VI of the amended disclosure statement recites in part:

*A. Preferences*

. . . . .

The transfers which are subject to recovery as "preferences" include certain payments made within the ninety (90) days prior to the debtor's commencement of bankruptcy proceedings....

The recovery of preferential transfers is a complex issue. With respect to the recovery of preferential transfers by the Liquidating Trustee under the terms of the Plan and the Liquidation Trust Agreement, an analysis would have to be made to determine if there was a transfer (i) of S.I.B.C.'s property, (ii) to or for the benefit of a creditor, (iii) for or on account of an antecedent debt, (iv) made while S.I.B.C. was insolvent, (v) within ninety (90) days of commencement of the Reorganization Proceedings, (vi) which enables a creditor to receive more than it would have been entitled to receive in a liquidation proceeding, if the transfer had not been made and the creditor had received payment to the extent provided by the Bankruptcy Code. In order to accurately calculate the amount of preferential transfers the Liquidating Trustee might be able to recover for the exclusive benefit of S.I.B.C., it is *necessary to evaluate each transaction* with each creditor *occurring during the ninety-day period.* The Trustee has conducted a review, based upon S.I.B.C.'s books and records, of transfers that may meet the criteria outlined above. *These transfers include early redemptions* by creditors of Investment Certificates, i.e., prior to face maturity date, and payments made during the ninety-day period to trade creditors. [Emphasis added.]

Section VIII of the amended disclosure statement provides in relevant part:

*E. Conditions Precedent to the Confirmation of the Plan.*

*1. Conditions Precedent Concerning the Investors.*

. . . . .

e. Prosecution of Preference Actions.

The Bankruptcy Code provides for the recovery by a debtor of certain preferential transfers, or "preferences," to creditors that were made shortly before the commencement of

Chapter 11 reorganization proceedings. The *transfers that are subject to recovery as preferences include certain payments made by the debtor within the ninety day period before the filing of the Chapter 11 petition.* The Bankruptcy Code empowers the Chapter 11 trustee to recover such preferences on behalf of the debtor's estate. As observed in several sections of the Disclosure Statement, potential preference actions amount to many millions of dollars. Accordingly, the Investors' obligations to perform under the Plan are contingent upon the commencement and pursual by the Trustee of the steps deemed necessary by the Trustee and the Successor in Interest to recover *any* such preferences. [Emphasis added.]

Significantly, the consolidated summary disclosure statement and summary of the plan mailed to creditors, incorporating the Bankruptcy Code definition of a preference, recites:

Preferential transfers consist of transfers (i) of S.I.B.C.'s property, (ii) to or for the benefit of a creditor, (iii) for or on account of an antecedent debt, (iv) made while S.I.B.C. was insolvent, (v) within ninety (90) days of the commencement of the reorganization proceedings, and (vi) which will enable a creditor to receive more than it would have been entitled to receive in a liquidation proceeding if the transfer had not been made.

The language in the amended disclosure statement relied upon by the defendants does indicate a limitation of avoidable preferences to include only the early redemption of investment certificates and trade preferences. However, such an interpretation disregards and is not consistent with: (1) the description of preferential transfers in the consolidated summary, and (2) the general meaning in bankruptcy of "preference" and the use of that term in the previously quoted exhortation that withdrawals during the preference period be refunded, as well as in sections VI A and VIII E of the amended disclosure statement. Additionally, it is explicitly stated in section VIII G.8 of the amended disclosure statement that the enforcement of preference and fraudulent conveyance actions is the most significant—moreso than the investment of not less than $3,000,000.00—financial means for effectuation of the plan. Under this circumstance, a limitation by the plan proponents of the preference actions the liquidating trustee might pursue is contrary to reason.

Reading the amended disclosure statement, the plan as confirmed, and the consolidated summary in their entirety, plaintiff's complaints against defendants who received payment against matured investment certificates during the preference period are not inconsistent with the terms of the confirmed plan of reorganization. *Cf. Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank,* 55 B.R. 253, *aff'd,* 62 B.R. 224 (S.D.N.Y.1986) (Bankr.S.D.N.Y.1985) (debtor in possession judicially estopped to pursue preference avoidance where disclosure statement recited that it had no preference actions).

## IX

### *Conclusions*

This court has jurisdiction to adjudicate the consolidated preference actions; 28 U.S.C.A. § 157(b)(2)(F) (West Supp.1986) is not unconstitutional; extension of the term of service of the bankruptcy judges by the Bankruptcy Amendments and Federal Judgeship Act of 1984 does not violate the Appointments Clause. SIBC was eligible for relief as a debtor in bankruptcy. 11 U.S.C.A. § 109 (West 1979 & Supp.1986). Plaintiff's claims are not barred due to either lack of formal notice to defendants of the SIBC bankruptcy proceedings or alleged prepetition fraud. Plaintiff does have standing to pursue these preference actions and the recovery, if any, will properly benefit unsecured creditors. Neither laches nor waiver is a defense to plaintiff's claims. Further, pursuance of these preference actions is not contrary to the terms of the confirmed plan of reorganization.

370

Plaintiff is not entitled to summary judgment on the § 547(b)(5) element of a preference. Plaintiff's request for summary judgment as to the inapplicability of the defense set forth in § 547(c)(1), (2) and (4), is premature—plaintiff has not established all the elements of § 547(b)—and hence denied. Further plaintiff's request for a determination that, for the purposes of § 547(c)(2), the debt represented by a defendant's investment certificate was incurred on the date of purchase and his request for a ruling on prejudgment interest are likewise premature and denied.